# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                    No: 1:15-cr-03394 WJ

FIDAL ABDELJAWAD,

    Defendant.

## MEMORANDUM OPINION AND ORDER OVERRULING IN PART AND SUSTAINING IN PART DEFENDANT'S OBJECTIONS TO THE PRESENTENCE REPORT and COURT'S DETERMINATION OF DEFENDANT'S ADVISORY SENTENCING GUIDELINE RANGE

THIS MATTER comes before the Court following a sentencing hearing on December 12, 2017, regarding Defendant Fidal Abdeljawad's Sentencing Memorandum and Objections to the Presentence Report, filed November 2, 2017 (**Doc. 131**).[1] The Government filed a supplemental brief on January 2, 2018, and supplemented the record on January 10, 2018. Having reviewed the pleadings, and heard the arguments of counsel, the Court **SUSTAINS in part** and **OVERRULES in part** Defendant's objections to the Presentence Report (PSR).

## BACKGROUND

The Superseding Indictment **(Doc. 29)** charged Defendant as follows:

    Count 1 - conspiracy to possess with intent to distribute synthetic cannabinoids, in violation of 21 USC § 846;
    Count 2 – On May 7, 2014, possession with intent to distribute mixture containing detectable amount of UR-144, XLR11, 5F-PB-22 and AB-

---

[1] At the hearing, the Court heard arguments on Defendant's objections to the presentence report and argument as to the proper guideline sentence, but did not hear arguments on Defendant's request for a downward variance. The Court will set a hearing regarding the downward variance at a later time.

FUBINACA, each Schedule I controlled substances, in violation of 21 USC § 841(a)(1) and (b)(1)(C).

        Count 3 – On May 8, 2014, Defendant (and Ashley Watson) intentionally possessed with intent to distribute a mixture containing a detectable amount of UR-144, XLR11, 5F-PB-22 and AM-2201, each a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

        Count 4 – On or about February 19, 2015, the defendants unlawfully, knowingly and intentionally attempted to commit an offense defined in 21 U.S.C. 841(a)(1), that is, to possess with intent to distribute a mixture and substance containing a detectable amount of XLR11, a Scheduled I controlled substance.

A jury found Defendant guilty on all four counts on May 5, 2017. Defendant was thus found guilty of possessing or attempting to possess with intent to distribute five Schedule I controlled substances, XLR11, UR-144, 5F-PB-22, AM-2201, and AB-FUNICA. All are synthetic cannabinoids, sprayed on plant material and designed to appear like Marihuana.

On July 13, 2017, the United States Probation Office disclosed the PSR, indicating an advisory sentencing guideline range of 188 to 235 months based on a base offense level of 32. The PSR added two points for maintaining a premises for storing and distributing a controlled substance pursuant to U.S.S.G. § 2D1.1(b)(12) and two additional points for leading or supervising a criminal activity pursuant to U.S.S.G. § 3B1.1(c)[2] for a total offense level of 36 and criminal history category of I.

The PSR indicated that the following grams of synthetic cannabinoids are attributable to Defendant:

| Description: | Quantity: |
|---|---|
| Search of Sean's Smoke Shop on May 7, 2014; | 379.8 grams |
| Search of Abdeljawad's van on May 7, 2014; | 2.9 grams |
| Search of Cube Smart Storage Unit on May 8, 2014; | 1,567.6 grams |
| Estimated synthetic cannabinoid shipments received from Ramzi Kahala on behalf of Abdeljawad from February to May 2014; | 42,000 grams |

---

[2] Defendant does not object to these four additional points.

| Estimated synthetic cannabinoid shipments from Imad Al Qattawi to Abdeljawad on October 15, 2014; | 5,185 grams |
|---|---|
| Intercepted communication on December 17, 2014; however, insufficient information is available to reliability estimate the drug quantity; | Unknown |
| Estimated on December 30, 2014, shipment from Saleem Salam; | 546 grams |
| UPS parcel intercepted on February 19, 2015: | 203.3 grams |
| **Aggregated Total:** | **49,884.6 grams** |
| U.S. Currency Forfeited $10,904.81 (Smoke shop). DEA typically purchased each gram for approximately $5 per gram. | 2,180.962 grams (cash conversion) |
| **Total:** | **52,065.56 grams Synthetic Tetrahydrocannabinol** |
| **Total Marijuana Equivalency: 1 gm Synthetic Tetrahydrocannabinol = 167 gm of marihuana** | **8,695 kilograms marihuana** |

*PSR*, at ¶ 35.

On January 19, 2018, the Government filed a supplement asserting that additional shipping records were been obtained from Fed Ex **(Doc. 151)**. The Government asserted that shipping records indicate that seven additional unseized shipments were sent to Ramzi Kahala, for Defendant, raising the total amount of synthetic tetrahydrocannabinol to 104,883.56 grams. Moreover, the supplement included the shipment seized in May 2014 (7,000 grams), which was apparently previously omitted from the PSR. Probation supplemented the PSR to include this updated total.

The Court directed Defendant to respond to the supplement to the PSR **(Doc. 152).** Defendant responded on May 14, 2018, and did not object to the supplementation, but argued for a downward variance.

**DISCUSSION**

**I.**     **Conversion Ratio for Synthetic Cannabinoids**.

Defendant objects to the use of the THC to Marihuana equivalency ratio of 1:167. First, Defendant argues that the specific synthetic cannabinoid chemicals at issue are not substantially similar to THC, and therefore the Court should apply the 1:1 marihuana equivalency ratio instead. Second, Defendant challenges the validity of the 1:167 equivalency ratio used in the Guidelines.

### A. THC to Marijuana Ratio of 1:167 Applies Because Synthetic Cannabinoids at Issue are Substantially Similar to THC.

Where, as here, a controlled substance is not specifically referenced in the Guidelines, the Court must calculate a defendant's base offense level by using the drug-equivalency ratio for the most closely related substance found in the Guidelines. U.S.S.G. 2D.1. cmt. n. 6. In determining the most closely related controlled substance, a court must consider:

> (A) Whether the controlled substance not referenced in this guideline has a chemical structure that is substantially similar to a controlled substance referenced in this guideline.
>
> (B) Whether the controlled substance not referenced in this guideline has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to the stimulant, depressant, hallucinogenic effect on the central nervous system of a controlled substance reference din this guideline.
>
> (C) Whether a less or greater quantity of the controlled substance not referenced in this guideline is needed to produce a substantially similar effect on the central nervous system as a controlled substance referenced in this guideline.

U.S.S.G. 2D1.1 cmt n. 6.

This similar-substance question is a factual determination. *See United States v. Ramos*, 814 F.3d 910, 918 (8th Cir. 2016). It appears that Defendant only challenges whether THC is the most closely related substance to UR-144, but the Court analyzes all the synthetic cannabinoids at issue below. The Government produced reliable evidence, in the form of expert reports and

expert testimony from Dr. Trecki, that THC was the most closely related substance in the Guidelines.³

As to Factor A, both Plaintiff and Defendant agree that the synthetic cannabinoids at issue do not have chemical structures similar to any controlled substance listed in the Guidelines. However, this is not fatal to a finding that the synthetic cannabinoids are substantially similar to THC. *See, e.g., United States v. Ramos*, 814 F.3d 910, 918 (8th Cir. 2016); *United States v. Novak*, 841 F.3d 721, 730 (7th Cir. 2016).

As to Factor B, the Government's expert concluded that all five substances have effects on the central nervous system that are substantially similar to the stimulant, depressant, and hallucinogenic effect of THC. Dr. Trecki performed *in vitro* tests, which demonstrated that all five synthetic cannabinoids and THC attach to the same receptor. He also performed *in vivo* tests on animals, indicating that all five synthetic cannabinoids had substantially similar effect as THC. All five chemicals produce psychoactive hallucinogenic responses to a greater degree than THC. The effects under human case studies, amnesia, anxiety, ataxia, confusion, dizziness, hallucination, paranoid reaction, nausea or vomiting, and tachycardia are similar to the effects of THC. These effects generally do not occur with Marihuana. Exhibit E, at 40, 44 (5F-PB-22 associated with multi-organ failure, cardiac arrest, and death, which are not seen with marihuana). Moreover, unlike Marihuana, individuals can overdose or suffer substantial bodily

---

[3] To satisfy these factors, the Government attached to its response expert reports from Dr. Jordan Trecki, a DEA pharmacologist, analyzing all five synthetic cannabinoids. The Government also attached expert testimony from Dr. Trecki from another case analyzing these specific synthetic cannabinoids. At the sentencing hearing, Defendant did not object to this evidence. Instead, the parties agreed that the Court could rule on the briefs. Therefore, the Court will consider the exhibits attached to the Government's response. Moreover, the Federal Rules of Evidence do not apply at sentencing. Fed. R. Evid. 1101(d)(3). Instead, the Court may consider relevant information without regards to admissibility under the rules of evidence provided the information has sufficient indicia of reliability. U.S.S.G. 6A1.3; *See also United States v. Beaulieu*, 893 F.2d 1177, 1179–80 (10th Cir. 1990) (transcript from trial in another case admissible).³ The Court concludes that this evidence has sufficient indicia of reliability. Defendant did not provide his own expert reports, expert witnesses or evidence to rebut the Government's evidence. Instead, Defendant relies on the recitation of expert testimony in published case law. Dr. Trecki is often the expert referenced in those cases.

injury or death as a result of ingesting these synthetic cannabinoids. This factor weighs in favor finding that the synthetic cannabinoids are substantially similar to THC.

As to Factor C, Dr. Trecki concluded that all five synthetic cannabinoids are at least as potent, if not more potent, than THC. Exhibit D; Exhibit E at 46. Under animal studies, the animals could not differentiate between the synthetic cannabinoids and THC. Dr. Trecki testified that several of these synthetic cannabinoids were far more potent than THC, and had more severe effects in humans than THC. *See* Exhibit E at 38-44; *see also* Exhibit E at 46 (UR-144, XLR-11, and 5F-PB-22 were at 2 to 21 times more potent than THC). There is no "safe amount" of synthetic cannabinoids, and any amount can cause an overdose or death. Exhibit E, at 39. The Court concludes that this factor weighs in favor of finding that the synthetic cannabinoids at issue are substantially similar to THC. *See, e.g., United States v. Novak*, 841 F.3d 721, 730 (7th Cir. 2016) (district court finding that THC is the most closely related controlled substance to XLR-11, UR-144, PB-22, and 5F-PB-22 was not clear error).

Defendant argues that marihuana is the proper comparator, rather than THC, because the synthetic cannabinoids as sold include large quantities of plant matter and otherwise appear and are smoked like marihuana. Initially, the Court notes that Defendant has not provided evidence that synthetic cannabinoids are different in character and effect when they are applied to plant material. Defendant instead relies on comments in case law for this proposition. In fact, experts in other cases have concluded that spraying synthetic cannabinoids on plant material does not change the substance's character or potency. *See United States v. Ramos*, 814 F.3d 910, 919 (8th Cir. 2016). Moreover, the evidence in this case indicates that application on plant material does not change the effect of the synthetic cannabinoids. Case reports cited by Dr. Trecki indicate that one "hit" from a cigarette containing this plant mixture can cause death, unlike marihuana.

6

Exhibit E, at 39. There is no "safe amount" of synthetic cannabinoids; any amount sprayed on plant material could cause the above effects. *Id.* The evidence indicates that synthetic cannabinoids do not become like marihuana in effect merely because they are sprayed on plant material.[4]

Moreover, when correctly calculating the advisory Guideline range, the Court is required to determine whether the controlled substance, i.e., the synthetic cannabinoids and not the plant mixture, are substantially similar to THC or marihuana under Factors B and C. U.S.S.G. 2D1.1 cmt n. 6. *See Ramos*, 814 F.3d at 919 ("while synthetic cannabinoids, such as XLR–11, are listed in Schedule I," the product mixture sold by the defendants was "not independently listed on any drug schedule."), *quoted in United States v. Hurley*, 842 F.3d 170, 173 (1st Cir. 2016).

Later, when calculating the drug quantity, the Court must consider the weight of the entire mixture. *See* 2D1.1 cmt n. 1; *United States v. Stewart,* 761 F.3d 993, 1001 (9th Cir. 2014) ("Drug quantity under the guidelines includes the entire weight or volume of any mixture containing a detectable amount of controlled substance, without regard to purity or concentration."), *quoted in United States v. Ramos*, 814 F.3d 910, 920 (8th Cir. 2016). As noted below, any sentencing disparities resulting from the failure to recognize the difference between pure synthetic cannabinoids and plant mixture should be considered when determining a variance, and not in the calculation of the advisory guideline range.

> **B.** **THC to Marijuana Ratio of 1:167 is Appropriate.**

Defendant nevertheless argues that the Court should not apply the 1:167 ratio, because the ratio lacks scientific support or sound policy basis, is arbitrary, or would result in treating dissimilarly situated defendants similarly.

---

[4] As noted above, marihuana is a combination of 800 chemicals in addition to THC. At least one of these chemicals has a moderating effect.

The Tenth Circuit has not ruled on the validity of the 1:167 ratio. However, the Tenth Circuit has held that the Guidelines need not have a scientific or empirical basis, and can instead follow policy. *United States v. Alvarez-Bernabe*, 626 F.3d 1161, 1165-66 (10th Cir. 2010). Moreover, all circuit courts considering this challenge have concluded that the 1:167 ratio is valid. *See United States v. Hurley*, 842 F.3d 170, 173 (1st Cir. 2016) (once district court determined that THC was the appropriate comparator, court was required to apply 1:167 ratio in calculating a guideline sentence); *United States v. Malone*, 828 F.3d 331, 337-38 (5th Cir. 2016) (upholding the district court's application of the 1:167 ratio); *United States v. Ramos*, 814 F.3d 910, 918-20 (8th Cir. 2016) (same); *United States v. Carlson*, 810 F.3d 544, 556 (8th Cir. 2016).

To calculate the advisory guideline sentence, the Court may not consider any other ratio not listed in the Guidelines. *United States v. Hurley*, 842 F.3d 170, 173 (1st Cir. 2016). After finding that the synthetic cannabinoids are substantially similar to THC, the Court is required to use the 1:167 ratio as set forth in the Guidelines to correctly calculate the advisory Guideline range. However, the Court may consider a different ratio in calculating a downward variance. *Id*. Upon agreement of the parties, the Court will defer any consideration of a variance until after a further sentencing hearing on variances or departures. At that time, the Court will consider any argument that applying the 1:167 ratio or using the weight of the plant matter results in a sentence greater than necessary to accomplish the purposes of sentencing articulated in 18 U.S.C. § 3553(a).

II.     **Quantity of Cannabinoids Attributable to Defendant.**

The PSR and the Government estimate that 104,883.56 grams of synthetic cannabinoids are attributable to Defendant. Multiplied by the 1:167 ratio THC to Marihuana ratio, the PSR

estimated that this was equivalent to 17,515 kilograms of marihuana, placing Defendant at a base offense level of 34. § 2D1.1(c) (drug quantity table).

Defendant objects to the PSR's factual findings, and instead argues that only 7,827 grams are attributable to him. Initially, the Court notes that Defendant challenges the findings of the quantities attributable to him, but does not challenge the accuracy of the facts upon which the PSR relies to make its estimates.[5] Instead, Defendant argues that those facts are insufficient to arrive at certain estimates of quantities, because either the suspected cannabinoids were not analyzed or the information is insufficient to make an estimate.

Under U.S.S.G. § 2D1.1, to reach a base offense level of 32, the quantity of marihuana must be at least 3,000 Kg but less than 10,000 KG. § 2D1.1(c)(4). To reach a base offense level of 34, the Government must show that more than 10,000 KG are attributable to Defendant. Using the 1:167 conversion ratio, this Court need only find that 17,964.07 grams of synthetic tetrahydrocannabinol are attributable to Defendant to reach a base offense level of 32. *See, e.g., United States v. Rollen*, 239 F. App'x 451, 455 (10th Cir. 2007).

A.     **Subset Testing.**

On May 7, 2014, the Government seized 382.7 grams of synthetic cannabinoids from Defendant's smoke shop and van. Defendant objects to 365.7 grams, which were not analyzed and therefore listed in the PSR as "estimated." On May 8, 2014, the Government seized 1,567.6 grams of synthetic cannabinoids from a storage unit. Defendant objects to 1,506.9 grams, which were also not analyzed and therefore listed as "estimated." Defendant appears to argue that any amount not analyzed should not be attributable to Defendant, even though a subset of those drugs

---

[5] Mr. Kahala testified at trial that he was a middleman, receiving packages of synthetic cannabinoids at his house for Defendant. Defendant states that Kahala's testimony at trial was discredited at trial, but does not state in what ways. Defendant was convicted on all charges, likely in part on the basis of Kahala's testimony. Moreover, as explained below, the Court generally finds Kahala's testimony to be credible.

were tested. Thus, Defendant does not appear to object to attack the validity of the testing in this instance, but rather, to subset testing itself. The validity of subset testing has been established. *See United States v. Garner*, 223 F. App'x 792, 795–96 (10th Cir. 2007) (setting out test for establishing sampling technique was reasonably reliable). The Government need not test every gram seized where the drugs were seized together. *Id.* ("The general rule is that a quantity of drugs found together is considered a single unit for purposes of prosecution."); *See also* **PSR, ¶ 15 and 18.** Moreover, the sampling technique was established at trial, where the Government submitted expert testimony from three witnesses. *Garner*, 223 F. App'x at 796 (10th Cir. 2007), *citing United States v. McCutchen,* 992 F.2d 22, 24–26 (3d Cir. 1993). Defendant has not alleged that the sampling technique was not reasonably reliable. Therefore, the Court concludes that 1,950 grams[6] are attributable to Defendant.

### B. <u>Estimate of Synthetic Cannabinoids in Unseized Shipments sent to Kahala.</u>

Defendant objects to the estimate that Kahala received six shipments of synthetic cannabinoids, totaling 42,000 grams, in the mail for Defendant. Kahala testified that he served as a middleman, receiving shipments from Imad Al Qattawi destined for Defendant, and that he received at least six shipments for Defendant that contained synthetic cannabinoids, between February to May 2014. The Government seized one shipment in May 2014, tested it, and found that it contained 7,000 grams of UR-144 or AB-FUBINACA, both Schedule I controlled substances. Based on that shipment, the PSR estimated that all six unseized shipments contained the same amount, for a total of 42,000 grams of synthetic cannabinoids. Defendant argues that there is insufficient proof that (1) each shipment contained synthetic cannabinoids; (2) the quantity of synthetic cannabinoids in each shipment; (3) or that shipments are attributable to Defendant.

---

[6] For all calculations, the Court has rounded down.

1.  <u>Estimation</u>.  "The government bears the burden to prove drug quantity through a preponderance of the evidence.  The base-offense level may consist of an estimate if it contains some record support and is based on information bearing "minimum indicia of reliability." *United States v. Dahda*, 852 F.3d 1282, 1294 (10th Cir. 2017) (internal citations omitted), *cert. granted*, 138 S. Ct. 356 (2017); *See also* U.S.S.G. § 2D1.1 n.5 ("where there is no drug seizure or the amount seized does not reflect the scale of the offense, the Court shall approximate the quantity of the controlled substance.  [T]he Court may consider… similar transactions in controlled substances by the Defendant").  "When the actual drugs underlying a drug quantity determination are not seized, the trial court may rely upon an estimate to establish the defendant's guideline offense level so long as the information relied upon has some basis of support in the facts of the particular case and bears sufficient indicia of reliability. However, the need to estimate drug quantities at times is not a license to calculate drug quantities by guesswork." *United States v. Dalton*, 409 F.3d 1247, 1251 (10th Cir. 2005) (internal citations and quotations omitted).  "[W]hen choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution." *United States v. Richards,* 27 F.3d 465, 469 (10th Cir.1994) (internal quotation marks omitted); *see also United States v. Siyam*, 325 F. App'x 675, 683 (10th Cir. 2009).

2.  <u>Shipments to Kahala are Attributable to Defendant</u>.  At issue is whether (1) all six unseized packages sent from Qattawi to Kahala are attributable to Defendant, and (2) whether those packages contained synthetic cannabinoids.  Kahala credibly testified that he served as a middleman, receiving at least six shipments of synthetic cannabinoids from Qattawi

for Defendant between February to May 2014.[7] Defendant agreed that the shipment seized at Kahala's house is attributable to Defendant. Therefore, Defendant appears to agree that Kahala served as a middleman and passed drugs along to Defendant.

Kahala's testimony is corroborated by shipping and phone records. Shipments were sent no more than ten days apart. This is supported by shipping data from Fed Ex shipping records, indicating that six packages were sent from the same shipping account from Florida (Qattawi's state of residence) to Kahala's home in February and March 2014. At the same time, the call logs between Qattawi, Kahala, and the Defendant indicate there was increased communication between the three during this time. Transcripts of communications between Qattawi and Defendant show that Qattawi sent Defendant synthetic cannabinoids in other instances. Kahala opened up two of the boxes, and saw that they contained synthetic cannabinoids. He also testified that each shipment contained approximately 1,500 to 2,000 packets of synthetic cannabinoids.[8]

One shipment was seized in May 2014. The shipment weighed 33 pounds, and after removing the packaging, there was a net 7,000 grams of synthetic cannabinoids. A lab test of the May 2014 seized shipment indicated that each packet weighed an average of 5.185 grams. The gross weight of the six unseized shipments according to Fed Ex shipping records varied between 23 and 42 pounds, with an average weight of 30.8 pounds.

The Court finds that, based on Kahala's testimony, these six unseized shipments are attributable to Defendant and that they also contained synthetic cannabinoids, like the seized

---

[7] The testimony was that there were *at least* six shipments, supported by Fed Ex shipping records showing six packages and their weight. The PSR and these Fed Ex shipping records did not include the package seized on May 8th, 2014.

[8] On cross examination, Kahala agreed when Defense counsel said the packages contained at least 2,000 packets of spice each. Tr. p. 79.

shipment. Kahala's testimony and corroborating evidence indicate that these six shipments were part of the same course of conduct as the seized shipment.

The Government argues that seven additional unseized shipments should be attributable to Defendant, based on Fed Ex shipping records discovered late. These additional seven shipments bear some similarities to the other eight shipments. *see* U.S.S.G. § 2D1.1 cmt. 12 ("In [estimating the quantity of a controlled substance], the court may consider ... *similar* transactions in controlled substances by the defendant ...." (emphasis added)). However, because Kahala testified that he received at least six shipments of synthetic cannabinoids on Defendant's behalf, the Court will limit the unseized shipments attributable to Defendant to six.

Defendant asserts that Kahala's testimony was not credible. The Court finds Kahala's testimony credible, and the Court may rely on his testimony in estimating drug quantities and that he received these shipments on behalf of Defendant. *See United States v. Cook*, 949 F.2d 289, 296 (10th Cir. 1991) ("During sentencing, a court may weigh the credibility of a witness and rely on that witness's testimony if it is not vague."), *cited in United States v. Garcia*, 994 F.2d 1499, 1508 (10th Cir. 1993).

3. <u>Court should apply net drug weigh to total shipment weight ratio to unseized packages</u>. The PSR estimates that all six unseized packages contained 7,000 grams of synthetic cannabinoids each. This inference, although permissible in some circumstances, is not permissible here because there is evidence that each package weighed a different amount.

The Government proposes that the Court apply the ratio of the net drugs to total package weight from the seized shipment, to the unseized shipments. The Court agrees. Although not addressed by the Tenth Circuit, most other circuits appear to approve similar methodologies of extrapolating the net drug quantity from a seized shipment to unseized shipments. *See United*

*States v. Sklar*, 920 F.2d 107, 113–14 (1st Cir. 1990) (extrapolating net weight of drugs in seized package to 11 unseized packages); *United States v. Morales*, 113 F.3d 116, 120–21 (8th Cir. 1997) (district court determination that marijuana constituted 57 percent of weight of shipment, and extrapolating it to unseized shipments, was reasonable way to estimate drug quantity of unrecovered packages); *United States v. Hilton,* 894 F.2d 485, 486-88 (1st Cir.1990)*; United States v. Ventimiglia*, 4 F.3d 995, 1993 WL 330643 (6th Cir. 1993) (extrapolating net weight of drugs in unseized shipments from seized shipments)*; United States v. Gonzalez,* 210 F.3d 373 (Table) (6th Cir. 2000) (holding that the district court did not err in determining the total quantity of marijuana and cocaine contained in 11 mail parcels based on the actual weight of marijuana and cocaine found in the only two mail parcels that were recovered); *United States v. Williams*, 576 F. App'x 124, 130 (3d Cir. 2014) ("The instant case is one in which the District Court made a reasonable assumption based on the ratio of marijuana to packaging in a test sample, and used it to extrapolate the marijuana content of the other packages."); *United States v. Almedina*, 686 F.3d 1312, 1316–17 (11th Cir. 2012) (court may extrapolate quantity drugs in seized package to unseized package); *United States v. Curry,* 188 Fed.Appx. 863, 876 (11th Cir. 2006) (extrapolating net drug quantity of three unseized from seized package); *United States v. Hollins,* 498 F.3d 622 (7th Cir. 2007) (drug quantity known from one smuggling trip may be extrapolated to other similar smuggling trips); *United States v. Levy*, 207 F. App'x 833, 837–38 (9th Cir. 2006) (district court properly ratio of total package weigh to drugs in seized package, to unseized packages); *United States v. James*, 113 F.3d 721, 731 (7th Cir. 1997).

The Court concludes that it may extrapolate the weight of the unseized shipments from the seized shipment because, as explained above, the shipments were part of the same course of conduct. *See, e.g., United States v. Siyam*, 325 F. App'x 675, 685 (10th Cir. 2009) (similar

pattern of operation was sufficient to support conclusion that same amount was in unseized duffle bags).

Here, the seized package's net drug quantity to total package weight was 46%. The average weight of the six unseized packages was 30.8 pounds. Converted to grams, the total net drug quantity of the six unseized packages was 38,557.2 grams. Even if the amount of packaging differed slightly, the drug quantities at issue here put safely above the threshold for a base offense level of 32. *United States v. Ortiz*, 613 F.3d 550, 559 (5th Cir. 2010).

The above is a conservative and cautious estimate. *United States v. Battle*, 706 F.3d 1313, 1320 (10th Cir. 2013) ("When choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution."). All decimals have been rounded down. Because Kahala testified he received six packages for Defendant, the Court limited Defendant's responsibility to the six unseized shipments. The PSR estimated that each shipment contained 7,000 grams of synthetic cannabinoids, based on the package seized in May 2014. However, since the unseized shipments weighed on average less than the seized package, the Court went with a lower estimate. Moreover, Kahala testified that each package contained 1,500 to 2,000 packets (averaging 5.185 grams each), which was a higher estimate than what the Court ultimately used.

Therefore, the Court sustains Defendant's objection in part, finding that 38,557 grams from the six unseized shipments are appropriately attributable to Defendant.

### C. Cash Conversion.

The Government seized $10,904.81 from Defendant's smoke shop. The government apparently attributed the entire amount to drug sales, and extrapolated that the cash was the product of the sale of 2,180.962 grams, based on a sale price of $5. The PSR provides that DEA

agents and confidential informants bought 'spice' for between $4 and $20 and the average sale price was $5. Defendant did not object to the accuracy of the sale price, but argues that there is insufficient evidence to make a determination that the cash was the product of drug sales.

Generally, "the sentencing court may estimate the quantity of drugs with which Defendant was involved by converting [seized] cash to its drug equivalent." *United States v. Rios*, 22 F.3d 1024, 1028 (10th Cir. 1994). This conversion is appropriate "provided the court finds by a preponderance that the cash is attributable to drug sales which were part of the same course of conduct or common scheme or plans as the conviction count." *Id.*

Defendant argued that this money did not come from the sale of drugs. The Court agrees that the the Government has failed to establish that the money seized from the smoke shop is attributable to the same course of conduct as his drug activities. The Government established that Defendant sold drugs at times out of his smoke shop. Although both drugs and cash were found in the smoke shop, there is nothing for the Court to conclude that the cash came from drug sales rather than legitimate sales. The Government's evidence solely involves Kahala's testimony about his own, separate smoke shop, but the Government did not explain how evidence about Kahala's smoke shop is relevant to Defendant's shop. There is no evidence or testimony for the Court to conclude that all or the majority of the sales in Defendant's smoke shop came from drug sales instead of legitimate sales. Since the Court is unable to determine how much of the cash came from drug sales, the Court concludes that this amount is not attributable to Defendant.

### D. Agreed Upon Quantity.

Intercepted phone calls showed that Defendant agreed to purchase 1000 packets from Qattawi, and Qattawi agreed to send the shipments. Generally, an agreed-upon quantity of a

controlled substance is used to determine the offense level. U.S.S.G. § 2D1.1 n.5. Laboratory tests of previous shipments supplied by Qattawi to Abdeljawad indicate that each packet contains an average of 5.185 grams. This evidence is sufficient to show that Abdeljawad agreed to purchase approximately 5,185 grams of synthetic cannabinoids.

Defendant argues that the PSR acknowledges that Defendant refused to receive the October 2014 shipment as an intermediary, because he did not want to forward the package to a competitor. Aside from this reading of the PSR, Defendant provides no other evidence to support this position. In fact, a transcript of the intercepted phone calls clearly indicate that Defendant accepted the shipment for his own use to the exclusion of the competitor. *See* Trial Exhibit 50 (B), Call 691, at 4 ("I will take the 1000 but I won't sell it to the son of a bitch mother fucker…"); Exhibit 50(b), Call 693 ("The 1000 I will have you send them tomorrow so I will get them on Monday… and I will deposit the money the next day."); *Id.* at 5 ("I am asking you not to send him anything… tomorrow, Friday I will you [sic] an address so you can send me the 1000 and I will deposit the money right way…"). Qattawi agreed to send the 1000 packets to Defendant instead of Defendant's competitor. *Id.* at 5.

E. **Summary of Quantity.**

The above totals 45,692 grams. Defendant has also admitted to the following: 7,000 grams from the package seized in May 2014[9]; 546 grams from a December 30, 2014 package shipped from Saleem Salam; and 203.3 grams in a UPS parcel intercepted on February 19, 2015.

Based on the above, the Court concludes that 53,441 grams of synthetic cannabinoids are attributable to Defendant. To reach a base offense level of 32, the Government needed to prove

---

[9] The PSR originally omitted the package seized in May 2014, and only included the six unseized shipments. *See* **Doc**. **116**. Initially, the Fed Ex Shipping records provided by the Government indicated there were six packages sent from February to March 2014, which did not include the package seized in May 2014. **Doc. 140-1.** This was corrected in the Government's supplement, **Doc. 151**, and subsequently in the supplement to the PSR. **Doc. 153.** Defendant did not object. **Doc. 158.**

that approximately 17,964.07 grams are attributable to Defendant. Defendant is clearly above this threshold, and the Court finds that his base offense level is 32.

III. **Advisory Sentencing Guideline Range**

Having sustained in part and overruled in part Defendant's objections to the PSR, the Court **FINDS** that Defendant's correctly calculated guideline sentence is a total offense level of 36, combined with a criminal history category of I, resulting in an advisory sentencing guideline incarceration range of 188 to 235 months.

Finally, the Court having ruled on Defendant's objections and having made findings regarding Defendant's correctly calculated guideline sentencing range, the Courtroom Deputy Clerk shall proceed to set this case for a final sentencing hearing where the Court will consider Defendant's request for a downward variance or departure, final arguments of counsel, and any statement the Defendant himself wishes to make.

**IT IS SO ORDERED.**

_____
CHIEF UNITED STATES DISTRICT JUDGE